# DUSTIN & MUSICK

*v.*

# SAMUEL P. HODGEN.

GUARANTY—*guarantors not liable beyond the express terms of their contract.* On May 1st, 1861, D & M, bankers, agreed with H, both parties residing and doing business at Lincoln, Ill., that he, H, might deposit certain " corn money," then in the hands of his agent in Chicago, to the amount of $1,000, with certain bankers in Chicago, to the credit of D & M; H to draw for the same upon the banking house of D & M, at Lincoln. At this time the currency of the country was in a very precarious condition, and H failed to make such deposit until seven days after the agreement therefor, and thereafter made other deposits, to D & M's credit, to the amount, in the whole, of $3,500, and shortly after, the bank became insolvent: *Held,* that in an action by H, against D & M, to charge them as guarantors of the deposits so made, they could not be held liable, the proof showing that the deposits made beyond the sum of $1,000, were without the authority or consent of D & M, and that no part of the funds were ever used or recognized by them, in any way, as their money, and that as to the deposit of the $1,000, it was not made within a reasonable time after the agreement therefor.

APPEAL from the Circuit Court of McLean county; the Hon. JOHN M. SCOTT, Judge, presiding.

The opinion states the case.

Mr. R. E. WILLIAMS and Mr. WM. McGALLIARD, for the appellants.

Messrs. GREEN & MOORE, for the appellee.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court :

This was an action of assumpsit, brought in the Logan Circuit Court, and by change of venue, taken to the McLean Circuit Court, by Samuel P. Hodgen against William M.

Dustin and George Musick, and a verdict and judgment for the plaintiff, a motion for a new trial having been overruled.

The defendants bring the case here by appeal, and assign as causes for reversing the judgment, that the verdict was against the law and the evidence; that the court gave improper instructions for the plaintiff; and last, that proper and relevant testimony, offered by the defendants, was ruled out.

It appears the parties were residents of Lincoln, in Logan county, the plaintiff doing business there as a merchant, in the spring of 1861, and prior thereto, and purchasing corn, which he sent to his commission merchants at Chicago, Mudd & Updyke, for sale. The defendants were bankers, at Lincoln, and had been, for some years previous to this controversy, doing business in the name of Dustin & Musick.

The plaintiff alleges, that the money arising from the sale of the corn, was, by the special request of the defendants, to be deposited by Mudd & Updyke with the banking house of Hoffman & Gelpcke, to the defendants' credit, with the understanding that plaintiff was to draw on the defendants, at Lincoln, for the money, and that the deposits made, at different times, amounted to thirty-five hundred dollars.

This is the plaintiff's statement of the case.

The defendants deny any such request, but admit they did, on one occasion, agree that plaintiff might so deposit one thousand dollars, provided it was done within a given time. That it was not deposited within the time, and that so soon as they were notified that this sum was so deposited, they refused to accept it, or draw for it, and that the plaintiff, notwithstanding this, continued afterwards, and without their knowledge or consent, to deposit money with that house, to the credit of defendants, all which was unauthorized by them, and was repudiated by them so soon as the fact came to their knowledge, and this is the issue between the parties.

The proof shows there was an agreement in April, 1861, as to this depositing, and that on the eighth of May, 1861, there

was deposited with Hoffman & Gelpcke, by Mudd & Updyke, for plaintiff, one thousand dollars; on the thirteenth of the same month, fifteen hundred dollars, and on the sixteenth of May, one thousand dollars, all to the credit of the defendants, of which the plaintiff was notified. This is the testimony of J. J. Mudd, of the firm of Mudd & Updyke, and he also states when he deposited the fifteen hundred dollars, he was instructed by plaintiff to deposit but one thousand dollars, but having the money on hand belonging to the plaintiff, he made the deposit fifteen hundred dollars, and he also says, the last thousand dollars they were instructed to deposit to the credit of Brainerd & Dustin, but he knowing there was no such firm then at Lincoln, Brainerd having sold out to Dustin & Musick, he took the responsibility of making the deposit to their credit.

There is no controversy about amounts, or time of actual deposit.

The questions are, at what time was it agreed that any deposit might be made, and what amount; and was the deposit of the agreed amount made in a reasonable time after the agreement. On this, the whole controversy turns.

The plaintiff endeavored, by the deposition of Thomas H. Denny, to establish the agreement, and for that purpose required him to state a conversation he had with Dustin, in the latter part of July or first of August, 1861. From this it appears, Dustin said there was an engagement with plaintiff to deposit " corn money," and that it was made on the first day of May, 1861, in Chicago ; that there was nothing said about the time when the deposit was to be made, but that plaintiff told him the corn was then sold, and he, Dustin, expected the deposit would be made in two or three days, but no part of it was made until the eighth of that month ; that had it been deposited at the time he expected, they could have used it without loss, but being so long delayed, they could not so use it, and he did not think himself bound, on the

eighth of May, for an arrangement he supposed would be complied with by the third or fourth, and that when the deposit was made, it was not worth what purported to be deposited, owing to the depreciation that had taken place in the currency then in use and so deposited. He said thirty-five hundred dollars had been deposited, an amount greater than was agreed upon or he expected.

J. J. Mudd testified, there was but one direction by plaintiff to his firm, and that was previous to the eighth of May, to deposit money as stated, and that direction was verbal, and was to deposit two thousand dollars when collected by him. This direction was given by the plaintiff when he was in Chicago.

In answer to a bill of discovery, filed by the plaintiff, against the defendants, they exhibited certain letters to them from Hoffman & Gelpcke, the first dated May 8, 1861, to the effect that they had credited their account with one thousand dollars, deposited by Mudd & Updyke for account of S. P. Hodgen. The other was dated May 15, 1861, saying, "We credit your account $1,500, deposited by Mudd & Updyke." The last letter bore date May 16, and says: "Your favor of the 15th inst., has been received, with inclosure as stated, for which we credit your account $400; also, deposit of Mudd & Updyke, $1,000, and two drafts, Charles Randolph, $400." These letters came duly to hand. The account current of Hoffman & Gelpcke with Dustin & Musick, was also an exhibit, in which it appears they were credited with these several deposits, and which account current they received after the 1st day of June, 1861. On the part of the defendants, the same Mr. Denny was called and sworn as a witness, and he testified that about the time he had the conversation with Dustin, detailed above, he had one also with the plaintiff, who told him that he had arranged with Dustin, in Chicago, about the 1st of May, to deposit some money in Chicago to the credit of defendants. He had told Dustin he wanted to deposit

enough to pay some debts he was owing, and wanted to pay them through the bank; he said he made this arrangement with Dustin, because, owing to the uncertainty in the value of money, he wished to avoid having it pass through his hands. The amount he wished to deposit, was enough to pay Edwards and Latham, to each of whom he was owing about one thousand dollars. He admitted that there was more money deposited than he himself expected, or than Dustin expected or agreed; not certain which word was used, and that the money was not deposited as soon as he or Dustin expected. He said that defendants were liable for two thousand dollars of the first deposit, and did not know, but thought he could hold them liable for the balance, but did not think he should; and, he further said, the defendants denied their liability for any of it. In that conversation, plaintiff said nothing about agreeing with Dustin that the money should be brought to Lincoln by express, at plaintiff's expense, but could not recollect what he said about that.

On the 11th day of May, 1861, J. M. Edwards, a creditor by note of the plaintiff, went to plaintiff's store to get payment, and after allowing plaintiff some credits, it was agreed between them that Edwards should have a certificate of deposit from the defendants for the balance of the note, which was about twelve hundred dollars. The plaintiff wanted his clerk to go with witness to defendants' bank, to get a certificate of deposit for this balance. The clerk told plaintiff it was of no use for him to go, for they would not give him a certificate, or that he could not get one, as they had refused the day before, to take money on deposit. Plaintiff himself then went with witness to defendants' bank, and asked Musick for a certificate of deposit for witness, for the balance, over twelve hundred dollars. The plaintiff asked Musick if he would give witness a certificate of deposit for one thousand dollars he had deposited to their credit at Chicago, with Hoffman & Gelpcke. Musick replied that he could not, and said to plaintiff, he ought not to

17—47TH ILL.

ask him to do such a thing as to take this thousand dollars in Chicago, and give witness a certificate for it there in Lincoln, in such precarious times. Plaintiff then said that under the circumstances, he did not know that he could blame Musick for not taking the money in Chicago and giving the desired certificate. Musick, at the same time said, they had more of the same currency on hand than they could use without loss, and also said, they were bound to lose money on the currency anyhow, on what they then had on hand, and that Dustin had telegraphed him from Chicago, not to take any more currency on deposit. Musick inquired of plaintiff who had been his banker theretofore, until this crisis came on until people got afraid of the money, to which plaintiff replied that he kept his money himself, and had been his own banker. Musick said he had refused to take money from his old customers, and that plaintiff had only deposited recently with them, since money was getting worthless. At this time, the plaintiff had a certificate of defendants, for some money he had previously deposited, and prevailed on Musick to take up the old certificate and give witness one for the balance, over one thousand dollars, that was coming to him on plaintiff's note, and Musick gave plaintiff a certificate for the remainder due on the old certificate. Plaintiff then wanted to give witness an order on defendants to draw this one thousand dollars, for the remainder due witness on plaintiff's note, and he carried it out, by giving him this instrument, dated May 11, 1861 : "I hereby authorize Dustin & Musick to use the thousand dollars deposited to their credit by Mr. John T. Mudd, as directed by John M. Edwards, administrator of Hiram Edwards' estate." Witness says when he read the paper, he objected to taking it, on the ground that, in his opinion, it was not written right. Hodgen told him that it was written right, so as to draw the money, but witness said, it was so drawn that it would hold neither Dustin & Musick, nor the drawer, responsible for the money. To this, Hodgen replied, that it had to be drawn in

that way, so as to authorize Dustin & Musick to draw the money for witness; that Mudd & Updyke were his agents to sell his corn, and that they had deposited the money with Hoffman & Gelpcke in Chicago, to the credit of Dustin & Musick by his direction. Under these circumstances and representations, witness took the order, gave up to Hodgen his note, and left the store. On his cross-examination he said, in the conversation he had with plaintiff before they went to the bank, Hodgen told him that he had made an arrangement with William Dustin, while in Chicago, to place one thousand dollars to the credit of Dustin & Musick for witness, and that he was to pay the expressage on it down to Lincoln, and said he intended the money for witness. He also said that Musick did not offer to pay him the amount for which Hodgen had requested a certificate of deposit, but he offered to take the order, and send for the money for witness, or would pay it to witness there at the bank, in such currency as they were using right along, but would not give a certificate for it.

Robert B. Latham details a transaction he had with plaintiff, about the middle of May, 1861, when arrangements were attempted through the bank of defendants, by which Latham could be paid a claim of one thousand dollars he had on the plaintiff. Plaintiff had told him, at that time, that he would leave the amount at defendants' bank, if it would suit him. Being told it would, the next morning Latham went with Mr. Lacy to the bank, who went there to receive the amount of a claim he held for collection on Latham, and on inquiry, he found the money was not left there. They then went to plaintiff's store, and Latham said to plaintiff, he did not leave the money at the bank for him. Plaintiff said no, but that he had deposited it at Chicago, at Hoffman & Gelpcke's to the credit of Dustin & Musick, for him. Latham then told him he did not want the money at Chicago. Plaintiff then gave Lacy a check on some person in Chicago, for

the amount of Latham's indebtedness, and ten dollars in money, and then Lacy left. Plaintiff remarked, he could not draw that money, that he would have to make some arrangement with Dustin & Musick, to get it, as the money was placed to their credit. Latham and the plaintiff then went to the bank, and plaintiff got Dustin & Musick to give their check on Hoffman & Gelpcke, to Latham, for the amount of the order plaintiff had given Lacy. Latham endorsed the check, and plaintiff took it to Lacy, to take up his own check. It came back from Chicago protested. While the parties were in the bank, Latham told defendants, if it would accommodate them, he would take the balance of the thousand dollars at Ridgely's bank, in Springfield, if they could send it there, and Ridgely would take it and pay some debts Latham was owing. Defendants told him they would send it to Springfield, but they never sent it. Most of Illinois currency at that time went down. Three or four days after this, Latham saw plaintiff, and in conversation remarked to him, Dustin & Musick would not be responsible for the money, to which he replied, they were not responsible, and ought not to be. The bank of Hoffman & Gelpcke was in good repute at this time. Latham further stated, on being re-examined, that plaintiff was to send the money to Springfield, if Ridgely would take it; that he had nothing to do with defendants.

In answer to the question of plaintiff, " did plaintiff agree that he, personally, would send this money to Springfield?" Latham answered, when he made the remark, that he would take the money at Springfield, Hodgen and Dustin talked together, and it was his best recollection that Dustin said he would send it. When asked by defendants, whose money it was that Dustin talked about sending to Springfield, and for whose accommodation, Latham answered it was for Hodgen's accommodation, and it was his understanding that it was Hodgen's money.

Mr. Lacy corroborates the principal part of this testimony, in relation to what transpired at defendants' bank, the exchange of drafts, and that the one he finally received, came back protested.

The defendants read in evidence the answer of J. J. Mudd, to certain questions put by the plaintiff, among them the ninth and eleventh. He says, in answer to the ninth, that he saw the plaintiff in Chicago, somewhere between the 20th of May and the 1st of June, 1861, who had with him a letter of authority, directed to the banking house of Hoffman & Gelpcke, authorizing him to draw from it, any money deposited with them by Mudd & Updyke, to the credit of defendants. It was in the handwriting of Dustin & Musick. He does not give the exact words of the letter, but it was addressed as above, and directed them to pay S. P. Hodgen any sum not exceeding the amount deposited by Mudd & Updyke. He went with plaintiff to the banking house, who presented the order to one of the bankers, probably Mr. Gelpcke, who refused to pay anything on it, giving as a reason, that the defendants should have stated some definite amount they should pay Hodgen, and added, he would pay no orders given in that way; thinks this was not after the 1st of June, and thinks not before the 20th of May.

The defendants then put in evidence the following paper, signed by plaintiff: "Lincoln Ill., June 10th, 1861. I have this day purchased of Dustin & Musick, a draft on Hoffman & Gelpcke for five hundred dollars, No. 1846, which they are not to be responsible to me for."

The plaintiff, in his answer to a bill of discovery, filed by defendants, against him, which they put in evidence, admitted at the time he got this draft, he paid no consideration for it; that when he went into their office to get it, he took, and delivered to Musick, a letter which Dustin & Musick had given him, which Mudd spoke about, and told Musick he could get no money on it; that Hoffman & Gelpcke said they would

not pay it because it specified no amount, and said to Musick that Hoffman & Gelpcke said they ought to have more sense than to send up such a paper, to which Musick replied, that he thought he could get the money on it. Plaintiff then told defendants that he had made an arrangement with Hoffman & Gelpcke that they would pay him Pamet money on their draft of Dustin & Musick, and that he had made arrangements so that he could use some Pamet money. Musick then said he would give him a draft for five hundred dollars on Hoffman & Gelpcke, if he, Hodgen, would release them from liability on the draft. He gave the release and the draft was given to him, and it was drawn against the money which had been deposited by Mudd & Updpke to the credit of the defendants.

The defendants then proposed to prove by Edward Thorpe, cashier of the Bank of Bloomington, that the currency of this State was in a precarious condition through the fore part of May, 1861; that from the first of that month, it depreciated very rapidly until about the seventeenth of that month, when it collapsed; that before that time, all banks, with few exceptions, were greatly under par, and their notes greatly depreciated, in some days in that month fifteen to twenty per cent., but the court refused to admit the testimony, and the defendants excepted.

The defendants then put in evidence the plaintiff's pass book with their banking house, by which it appeared that the account opened with plaintiff, on the 27th of April, 1861, by a credit of cash, one hundred and eighty-three dollars and forty-four cents, and under date of May 16th, is this credit to plaintiff: "By Mudd & Updyke, at Hoffman & Gelpcke, Chicago, 13th May, 1,000.' Another small credit under 21st May, of $2.25 cents appears, the whole footing up as credit, seventeen hundred and six dollars and sixty-nine cents. This amount was settled June 1, 1861, and the checks surrendered, there being a balance due plaintiff of one dollar and eleven cents. On that day, a new account was opened, the first item

of which, to plaintiff's credit, is this one dollar and eleven cents, with other items of cash, etc., amounting, in all, to eighty-two dollars and eleven cents to plaintiff's credit, and he is charged with cash paid him, seventy-five dollars, leaving a balance of seven dollars and eleven cents, which defendants pleaded they tendered to plaintiff before suit, and had the money in court, etc.

Now, as to the first point made by appellants, that the verdict is against the law and the evidence; the theory of appellee is, that defendants, by assenting to his proposition to deposit corn money with Hoffman & Gelpcke, at Chicago, to their credit, they became *ipso facto* guarantors, and were bound to make the amount deposited good to the plaintiff. All the instructions given in their behalf are based, more or less, on this theory, and discussing the theory disposes of the instructions.

By this theory, there is no limit as to amount of deposit, or time when it should be made, and the inquiry naturally arises, what motives prompted the parties to make such an agreement?

It may be said, the defendants being bankers in a country town, could not well be averse to have money to their credit in a large commercial city, for the use of which they paid no interest, and the possession of which extended their influence, and made, for them, profits. It is well known a banker's ability is measured, in no small degree, by actual deposits of money in his bank, or at points on which bills of exchange or drafts are frequently desired, for drawing which he receives a premium.

The motives of a depositor are various, depending on the circumstances of his particular business. In this case we are at no loss for the motive of the plaintiff, as he declared it himself. He was owing two parties, Edwards and Latham, each about one thousand dollars, more or less; the circulating medium with which debts were paid at the time of these

occurrences, was in a very shaky and doubtful condition, and he did not wish the money by which these creditors should be paid, to pass through his hands lest they might come back on him. It was a good stroke of policy, if he could get the payments made through bank checks or drafts, which, if paid in depreciated currency, and accepted by the drawees, would exonorate the debtor. He was a merchant, and, we should judge, quite an extensive dealer in one of the great staples of the country, and knew quite as well as the defendants, or as Mr. Cashier Thorpe, the miserable condition of the currency, and he knew that his corn, sold for him by Mudd & Updyke, had got into that shape. It would be a good thing, if he could so arrange it, that the proceeds of his corn, or any part of them, could be made available to him without much loss, and, as the defendants believed they could use one thousand dollars of it if deposited to their credit by the first of May, they were willing to be the medium by which some profit could be made to themselves, and the plaintiff, their townsman, be, at the same time, accommodated. Accordingly, the defendants assented to plaintiff's proposition, made on the first day of May, 1861, that he might deposit " corn money," not all the money he might thereafter receive for corn to be sold, but money on hand, with Mudd & Updyke, for corn sold in April preceding, with Hoffman & Gelpcke, then bankers in good standing at Chicago, to their credit. It was well understood the corn had been sold in April, and the proceeds, one thousand dollars, were, on the first day of May, in the hands of Mudd & Updyke, which they should and would have deposited on that day or the next. That they would do so was equally the expectation of both these parties. It was not deposited until the eighth, after the lapse of seven days, when the miserable currency system of the country was tottering to its base, and all sagacious men foresaw its sure and speedy overthrow. Appellee insists there was no time specified within which, or at which, the deposits should be made, and

if they were made at any time after the assent of defendants had been given, they became the guarantors of the funds.

·Let us consider this one moment.   In the first place, is the position reasonable?   Bearing in mind the circumstances, the condition of the currency at the time, we cannot believe sane men, shrewd business men as these parties seem to be, would come to any such agreement—the plaintiff, for its want of justice apparent on its face, the defendants, because they could see in it nothing but great loss and injury to themselves.   On the day their assent was given, they were in a condition to use one thousand dollars without loss, but *non constat* they were, or could be, on the eighth.   They are supposed to know their own business, what they could advantageously do, and what they could not so do, and in the absence of proof of any assent to this deposit of the eighth of May, or any use of it by the defendants, they cannot be bound by it, as it was not made in a reasonable time, and such appears to have been, at one time, the opinion of the plaintiff himself, if we are to believe the testimony of Edwards, when testifying in regard to the settlement of the claim he held against the plaintiff, and what transpired at the bank on the eleventh of May.   Then, but one thousand dollars had been deposited, which Musick refused to acknowledge as money with which his banking house was chargeable, by refusing to give a certificate of deposit as of money deposited with him.   Why did the plaintiff, on this occasion, at that time say he could not, under the circumstances, blame Musick for not taking the money at Chicago?   He, a shrewd business man himself, who had admitted the money was not deposited so soon as agreed or expected, knew and felt a conviction that to subject the defendants to the depreciation between the first and eighth, was neither honest nor just.   His own honest instincts told him this, and the same conviction induced him to say to Latham, about the middle of May, that "defendants were not responsible for the money, and ought not to be."

18—47TH ILL.

But it is further said, this assent of defendants that deposits might be made to their credit, was no contract for a valuable consideration, but a mere permission, revocable at any time, and that the transaction of the eleventh of May, to which Edwards was a party, was sufficient notice to the plaintiff that it was withdrawn, and that the paper the plaintiff then executed is a distinct acknowledgement that the deposits were, all the time, under his control.

To say there was no consideration for the agreement, is saying too much, for if the deposit had been made in a reasonable time thereafter, and of the amount specified, the benefits or profits which might have accrued to the defendants, would be a sufficient consideration; but waiving that question, as it is unimportant, what do the declarations of the plaintiff, culminated by the writing of that date, signify? Can the mind of any reasonable man come to any other conclusion than this, that at that date, May 11th, when one thousand dollars only had been deposited, the money was under plaintiff's control? Why authorize defendants to use it under the direction of Edwards, if it was money for which defendants were then responsible? There can be no other satisfactory answer given to this than, taken in connection with the declaration of his belief, expressed to Edwards at that time, that it was money wholly within plaintiff's own control. If it was defendants' money, no authority was necessary from plaintiff, and the writing would be impertinent.

There is no proof in the record, that the defendants ever used this deposit, or acknowledged responsibility for it in any way, except it be found in the fact, that they were informed in due course of mail, by Hoffman & Gelpcke, such a deposit was made to their credit on the eighth of May, and they did not repudiate or disclaim it.

Let us examine this proposition. The defendants had agreed, on the first day of May, that plaintiff might deposit

"corn money" to their credit with Hoffman & Gelpcke, bankers, at Chicago. What was the import of this agreement? Why, that if the money was deposited on that day or the next, or in a reasonable time thereafter, they would account to plaintiff for it. In the then state of the currency in which deposits were usually made, a few days was of vast importance, and it was competent for the defendants to deny a liability created by a deposit on the eighth. Did they not deny it? What does the testimony of Edwards amount to, when he details the transaction of the eleventh of May, and the execution of the paper by plaintiff, of that date, if it does not show most clearly a denial on the part of the defendants of all responsibility, an acquiescence therein by the plaintiff, and his assumption of control over the deposit, by the writing he executed? If, after this, the agent of plaintiff at Chicago, without any orders from him, made a deposit of fifteen hundred dollars to the credit of defendants, could they be bound by it, or by the last deposit made by telegram from the plaintiff, on the sixteenth of May, the day before the total crash? Was it the agreement that defendants should be guarantors for all the corn money Mudd & Updyke might deposit in this depreciated currency, under the pretext it was corn money, when in fact it was currency on their hands they did not know what better to do with, than to make defendants responsible for it. The transaction of eleventh of May, was sufficient notice to plaintiff, that such assent as defendants had given, was no longer in force, and he should have governed himself accordingly; but instead of instructing his agent not to make any further deposits, they do, without authority, deposit fifteen hundred dollars they choose to call "corn money," and afterwards, on a telegram from plaintiff five days after this transaction of the eleventh, deposit one thousand dollars additional, making in all, thirty-five hundred dollars, a very convenient plan by which to turn bad money into good, if it shall succeed.

But were the defendants bound, after the eleventh of May, to give any notice to Hoffman & Gelpcke? Why give notice to them? They had nothing *quoad hoc* to do with those bankers. They were selected by the plaintiff, and their agents, Mudd & Updyke, instructed accordingly. All the representations the defendants could make to these bankers, all their protests, however firm they might have been, could not have prevented them from receiving money from Mudd & Updyke to the credit of the defendants, if the depositors insisted it should be so entered on their books. If, however, it could be shown the defendants ever recognized the deposits as their money, by using them or appropriating them in any way, the case would be different. The testimony shows no such case, but it does show most distinctly, that the plaintiff controlled the first deposit, and that made on the thirteenth of May, for on his bank book, kept with defendants' banking house against the credit of one thousand dollars, on the sixteenth of May, deposited on the thirteenth, there is found an application of the amount on the debit side of this book, under the date, "May 16—Lacy, ten dollars; R. B. Latham, three hundred and thirty-eight dollars, eighty-eight cents; do. do., six hundred and fifty-one dollars, ten cents;" all which is explained by Latham and Lacy, and show the deposit of the thirteenth was appropriated by plaintiff. The weight of the testimony, about money being sent to Ridgely, at Springfield, being the amount of the draft for $651.10, is not that defendants had to send it, but plaintiff, as Latham states distinctly he had nothing to do with defendants—that the money was to come from plaintiff. There is not one iota of testimony in the record, that the defendants have availed of any of these deposits, and the question is, on whom the loss should fall, the Chicago bankers being insolvent.

From what we have already said, the question is easily answered. The evidence shows no responsibility on the defendants. Their assent was predicated on the fact that the

money was ready to be deposited on the first day of May, or in a day or two after, and would be so deposited. It was for the accommodation of the plaintiff, as well as for expected benefit to the defendants. The subsequent conduct of the plaintiff in reference to the first deposit, and the statement of defendants in relation to it, and acquiescence by the plaintiff, and his written authority of the eleventh of May, all conspire to relieve the defendants from all liability. He then thought the money was his own, and so treated it. And upon what other hypothesis can we account for the conduct of plaintiff, when on the tenth of June following, he purchased a draft of defendants on Hoffman & Gelpcke, for five hundred dollars, No. 1846, for which they were not to be responsible to plaintiff, except that he knew the defendants were drawing upon his own funds? There is no other way to account for it, and the plaintiff admitted it in his answer to the defendants' bill of discovery.

Suppose one of us should, for personal accommodation, request the clerk of this court, to draw quarterly the amount of his salary, and deposit it, to his own credit in bank, and the bank should fail, would it not be monstrous to charge the clerk with the loss? It is true, he obtained credit to the extent of the deposit—he had the use of it; but can it with justice be said he guaranteed the future solvency of the bank, and ought to be liable on its failure? We can see no difference in principle in the two cases.

We do not think the testimony of the cashier, Thorpe, was very material. He was asked to state facts, the existence of which had become a part of the history of the State, of which the court and jury might judicially take notice. If it was necessary to prove the precise day on which a rapid depreciation took place, it was competent, as showing the *animus* of the transaction.

It was sufficiently apparent that the suit was brought after the demand by Coddington.

. ' We have no time to discuss the instructions severally, which were given for the plaintiff. Some of them are opposed to the views we have presented, and on another trial, it will not be difficult to prepare instructions in conformity to this opinion.

The judgment of the circuit court is reversed and the cause remanded.

*Judgment reversed.*